UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAHJA FOSTER, as Next Friend of MB, a minor,

Plaintiff,

vs.

SPECTRUM HEALTH SYSTEM d/b/a SPECTRUM HEALTH; SPECTRUM HEALTH PRIMARY PARTNERS d/b/a SPECTRUM HEALTH MEDICAL GROUP, SPECTRUM HEALTH MEDICAL GROUP – OBSTETRICS AND GYNECOLOGY, COREWELL HEALTH OBSTETRICS & GYNECOLOGY – LAKEWOOD; HOLLAND COMMUNITY HOSPITAL d/b/a HOLLAND HOSPITAL; THOMAS FASBENDER, D.O.; BRETT ZIMMERMAN, D.O.; MICHELLE BROUWER, R.N.; ERIN ELENBAAS, R.N.; EMILY HAND, R.N.; and DIANA CONNELL, R.N.,

Defendants.

Case No.: ___________
Hon. ________________

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

JAMES J. HARRINGTON, IV (P65351)
GARY N. FELTY, JR. (P55554)
Attorneys for Plaintiff
Fieger, Fieger, Kenney & Harrington, P.C.
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555
Fax: (248) 355-5148
g.felty@fiegerlaw.com

## PLAINTIFF'S COMPLAINT

***NOW COMES*** Plaintiff, MAHJA FOSTER, as Next Friend of MB, a minor, through her attorneys, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., who states the following for her Complaint:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, MAHJA FOSTER, who may hereafter be referred to as "MS. FOSTER," is the mother of the minor child, "MB."

2. Plaintiff, MAHJA FOSTER, and her minor child, MB, are residents of Illinois.

3. Defendant SPECTRUM HEALTH SYSTEM is a Michigan nonprofit corporation that was created to perform the functions of and to carry out all of the purposes of a variety of hospitals and medical facilities and did business as "SPECTRUM HEALTH."

4. According to its restated articles of incorporation filed with the State of Michigan on October 29, 2015, SPECTRUM HEALTH SYSTEM was charged with the duty to perform the functions of and carry out all of the purposes of SPECTRUM HEALTH PRIMARY CARE PARTNERS.

5. Defendant SPECTRUM HEALTH PRIMARY CARE PARTNERS is a Michigan nonprofit corporation that was created to

provide primary care and specialty services to patients in communities served by SPECTRUM HEALTH SYSTEM.

6. Defendant SPECTRUM HEALTH PRIMARY CARE PARTNERS did, at all material times, do business as SPECTRUM HEALTH MEDICAL GROUP and operated a facility (where MAHJA FOSTER received prenatal care), that was located in Holland, Michigan known as SPECTRUM HEALTH MEDICAL GROUP OBSTETRICS AND GYNECOLOGY, LAKEWOOD.

7. Following a merger, the Lakewood Clinic continues to be operated by Defendant SPECTRUM HEALTH PRIMARY CARE PARTNERS, and is known as COREWELL HEALTH OBSTETRICS AND GYNECOLOGY, LAKEWOOD.

8. The aforementioned Spectrum entities were incorporated in Michigan, and their corporate offices and principal places of business are located in Michigan.

9. The Spectrum entities will hereafter be referred to as "SPECTRUM HEALTH."

10. Defendant SPECTRUM HEALTH conducted regular and systematic business in Ottawa County, Michigan at all material times

and continues to conduct regular and systematic business in Ottawa County.

11. Defendant HOLLAND COMMUNITY HOSPITAL d/b/a HOLLAND HOSPITAL, hereafter referred to as "HOLLAND HOSPITAL," is a Michigan hospital that, at all material times, conducted regular and systematic business in Ottawa County, Michigan.

12. HOLLAND HOSPITAL is incorporated in Michigan and its principal place of business is in Michigan.

13. Defendant THOMAS FASBENDER, D.O., (hereafter referred to as "DR. FASBENDER") is a physician licensed to practice in Michigan who resides in the State of Michigan and, at all material times, conducted regular and systematic business in Ottawa County.

14. Defendant BRETT ZIMMERMAN, D.O., hereafter referred to as "DR. ZIMMERMAN," who currently resides in Texas, was, at all material times, a physician licensed to practice in Michigan who conducted regular and systematic business in Ottawa County.

15. Defendant MICHELLE BROUWER, R.N., hereafter referred to as "NURSE BROUWER," who resides in Michigan, was, at all

material times, a nurse licensed to practice in Michigan who conducted regular and systematic business in Ottawa County.

16. Defendant ERIN ELENBAAS, R.N., hereafter referred to as "NURSE ELENBAAS," who resides in Michigan, was, at all material times, a nurse licensed to practice in Michigan who conducted regular and systematic business in Ottawa County.

17. Defendant EMILY HAND, R.N., hereafter referred to as "NURSE HAND," who resides in Michigan, was, at all material times, a nurse licensed to practice in Michigan who conducted regular and systematic business in Ottawa County.

18. Defendant DIANA CONNELL, R.N., hereafter referred to as "NURSE CONNELL," who resides in Michigan, was, at all material times, a nurse licensed to practice in Michigan who conducted regular and systematic business in Ottawa County.

19. Defendant SPECTRUM HEALTH is vicariously liable for the actions and inactions of its agents, ostensible agents and/or employees whether physicians, residents, or other healthcare providers, including but not limited to DR. FASBENDER and DR. ZIMMERMAN and any and all physicians, residents, or nurses under

their supervision, as set forth herein and incorporated by reference herein.

20. Defendant HOLLAND HOSPITAL is vicariously liable for the actions and inactions of its agents, ostensible agents and/or employees whether physicians, residents, or other healthcare providers, including but not limited to DR. FASBENDER and DR. ZIMMERMAN, and any and all physicians, residents, nurses or other healthcare providers under their supervision, including NURSE BROUWER, NURSE ELENBAAS, NURSE HAND, and NURSE CONNELL, who provided care and treatment to MAHJA FOSTER and MB, as set forth herein and incorporated by reference herein.

21. The amount in controversy exceeds seventy-five thousand dollars (>$75,000.00).

22. This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332.

23. The material events occurred in the Western District of Michigan.

24. Venue is proper pursuant to 28 U.S.C. §1391.

**FACTUAL ALLEGATIONS**

25. Plaintiff hereby restates and reincorporates each and every allegation set forth in the previous paragraphs of this Complaint as if fully set forth herein.

26. This is a shoulder dystocia and brachial plexus injury case involving the delivery of MB to her mother on November 4, 2016.

27. DR. FASBENDER managed the labor with the assistance of NURSE BROUWER and NURSE ELENBAAS.

28. DR. ZIMMERMAN delivered MB with the assistance of NURSE HAND and NURSE CONNELL.

29. Prenatal care was rendered by DR. FASBENDER at SPECTRUM HEALTH.

30. MAHJA FOSTER was twenty years old and experiencing her first pregnancy when she began seeing DR. FASBENDER at SPECTRUM HEALTH.

31. The facility where MS. FOSTER began seeing DR. FASBENDER was known as SPECTRUM HEALTH MEDICAL GROUP OBSTETRICS AND GYNECOLOGY – LAKEWOOD.

32. MS. FOSTER learned that she was pregnant in early 2016 and was first seen by DR. FASBENDER on March 4, 2016.

33. Her pregnancy was confirmed on March 10, 2016.

34. DR. FASBENDER charted that MS. FOSTER was overweight and became hypertensive during her pregnancy.

35. MS. FOSTER advised DR. FASBENDER that she was concerned that she could not handle labor.

36. MS. FOSTER went to HOLLAND HOSPITAL on November 2, 2016, because she had low abdominal cramping and back pain.

37. She had high blood pressure, elevated RBC, elevated hemoglobin, and was having contractions every twenty minutes, confirmed by electronic fetal monitor.

38. MS. FOSTER was discharged with instructions regarding hypertension in pregnancy and Braxton Hicks contractions.

39. Instead of seeing DR. FASBENDER at a scheduled appointment, on November 4, 2016, MS. FOSTER went to HOLLAND HOSPITAL at approximately 6:00 A.M., reporting spontaneous rupture of her membrane.

40. MS. FOSTER had high blood pressure upon admission, which remained high throughout labor and delivery.

41. MS. FOSTER was given oxytocin which resulted in tachysystole and she was administered an epidural anesthetic at

approximately 1:00 p.m. after NURSE ELENBAAS charted dilation of 2 cm at 8:51 a.m. and 4 cm at 12:35 p.m., fetal station -2, with 80% effacement.

42. The hospital chart contains no further documentation of cervical dilation until 4:24 p.m. when NURSE BROUWER charted dilation to be 8 cm, effacement of 90% and fetal station 0.

43. DR. FASBENDER thereafter charted dilation of 9 cm at 5:08 p.m., and at 5:17 p.m. he documented that fetal station was +1.

44. NURSE BROUWER charted cervical dilation to be a full 10 cm at 6:22 p.m. with 100% effacement; however, fetal station was charted as "0."

45. MS. FOSTER was instructed to begin pushing at approximately 7:15 p.m.

46. By 8:00 p.m., fetal monitoring reflected late and variable decelerations in the face of labor dystocia.

47. Rather than converting the delivery to C-Section, DR. FASBENDER permitted labor to continue and NURSE BROUWER AND NURSE ELENBAAS instructed MS. FOSTER to change position and continue pushing with contractions.

48. NURSE BROUWER and NURSE ELENBAAS did not inform anyone of the probability of labor dystocia or advocate for C-Section.

49. At some point, DR. FASBENDER, NURSE BROUWER, and NURSE ELENBAAS left the hospital and DR. ZIMMERMAN took over management of the labor and delivery.

50. NURSE HAND and NURSE CONNELL replaced NURSE BROUWER and NURSE ELENBAAS.

51. NURSE HAND and NURSE CONNELL did not advocate for C-Section.

52. At approximately 10:22 p.m., when MS. FOSTER had been fully dilated and fully effaced for 4 hours, rather than performing an emergent C-Section, DR. ZIMMERMAN considered a vacuum assist delivery at approximately 10:37 p.m., confirming that he knew that labor had stalled.

53. Instead, DR. ZIMMERMAN allowed labor to continue.

54. According to the birthing record, MB's head was delivered at 10:48 p.m.

55. According to the chart, a shoulder dystocia was called.

56. Despite shoulder dystocia being called, NURSE HAND and NURSE CONNELL instructed MS. FOSTER to continue pushing.

57. NURSE HAND and NURSE CONNELL forcefully pushed down upon MS. FOSTER, applying fundal pressure.

58. Plaintiff alleges, upon information and belief, that Dr. Zimmerman did not timely and clearly instruct Ms. Foster to stop pushing or appropriately direct and reinforce such an instruction.

59. If evidence establishes that an instruction was given, Plaintiff pleads in the alternative that Ms. Foster complied and that no effective maternal expulsive force was operating during the documented head-to-body interval.

60. Though the medical records indicate that DR. ZIMMERMAN used the McRoberts maneuver, suprapubic pressure, episiotomy, removal of the posterior arm, and Reverse Woods Corkscrew to release MB's shoulder, delivery was allegedly accomplished in one minute, at 10:49 p.m.

61. Rather than using appropriate technique, based upon delivery circumstances, the documented maneuvers, the nature and severity of MB's injuries, DR. ZIMMERMAN quickly applied improper or excessive lateral traction to accomplish delivery.

62. The delivery produced terminal meconium and a true knot was discovered in MB's umbilical cord.

63. MB was delivered limp and apneic.

64. Left shoulder injury was prominent.

65. MB was diagnosed with left brachial plexus injury and Erb paralysis at HOLLAND HOSPITAL.

66. MB's injury was the result of excessive force at an excessive speed, and a misdirected angle during her delivery, the failure to instruct MAHJA FOSTER to stop pushing, and/or improper fundal pressure.

67. MB's paralysis did not improve with outpatient physical therapy.

68. MB was diagnosed with severe left brachial palsy dysfunction, monoparesis, and spinal root avulsion at Mott Children's Hospital on January 27, 2017.

69. MRI demonstrated left C6-C7 vertebral root avulsion and the presence of cerebrospinal fluid in the area of C5-C6 and C6-T1.

70. Mott physician, Dr. Mary Spires concluded that there were root avulsions at C6 and C7, a possible avulsion at C8 and probable ruptures at C5 and T1.

71. MB was scheduled for CTLO fitting and a triple nerve transfer.

72. Surgery was performed by the late Lynda Yang, M.D., on May 10, 2017.

73. Despite surgery, the application of a CTLO brace and extensive occupational and physical therapy at Lurie's Children's Hospital and Children's Hospital of Philadelphia (CHOP), MB remains disabled.

74. MB underwent left shoulder latissimus dorsi and teres major tendon transfer with axillary neurolysis and shoulder spica casting by Dr. Apurva Shah, M.D., in January 2021, at Children's Hospital of Philadelphia.

75. Despite the surgery, and multiple rounds of physical and occupational therapy, MB has had continued discomfort, inability to lift her arm, and weakness.

76. Dr. Matthew Amodeo M.D., of CHOP concluded that MB suffers from chronic atrophy of her left rotator cuff, deltoid, and biceps muscles.

77. MB suffers from ongoing neurological problems, pain, and weakness that will require continued treatment.

78. MB's injuries have already, and will continue to limit her development, her social interaction, as well as her employment potential and earning capacity.

**COUNT I**
**MEDICAL MALPRACTICE/NEGLIGENCE OF DEFENDANTS THOMAS FASBENDER, D.O. AND BRETT ZIMMERMAN, D.O.**

79. Plaintiff hereby restates and reincorporates each and every allegation set forth in the previous paragraphs of this Complaint as if fully set forth herein.

80. Defendants, THOMAS FASBENDER, D.O. and BRETT ZIMMERMAN, D.O., were, at all material times, practicing within the specialty of obstetrics and gynecology.

81. Defendants, THOMAS FASBENDER, D.O. and BRETT ZIMMERMAN, D.O., and any physicians, residents, or medical professionals under their supervision were required to provide a patient, including MAHJA FOSTER and MB, with acceptable care under the circumstances, in light of the state of the art existing at the time, and in light of the facilities available in the community or other facilities reasonably available under the circumstances.

82. Therefore, DR. FASBENDER and DR. ZIMMERMAN were required to do for MAHJA FOSTER and MB what an obstetrician of ordinary learning, judgment, or skill would do, under the same or similar circumstances in light of the state of the art existing at the time, and in light of the facilities available in the community or other facilities reasonably available, under the circumstances and refrain from doing what an obstetrician of ordinary learning, judgment, or skill would not do under the same or similar circumstances.

83. When presented with patients like MAHJA FOSTER and MB, the standard of practice or care required DR. FASBENDER and DR. ZIMMERMAN to timely and appropriately do all of the following:

a. Monitor the maternal patient and the baby for signs of distress,

b. Identify labor dystocia,

c. Recognize the presence of tachysystole and late decelerations,

d. Identify risk factors for traumatic birth,

e. Discontinue oxytocin,

f. Counsel the patient about the risk of birth injury including shoulder dystocia, and offer the patient the option of cesarean section when risk factors for traumatic birth became known,

g. Timely and appropriately offer and perform cesarean section to prevent birth injury,

h. Timely recognize shoulder dystocia and, upon recognizing shoulder dystocia, timely and clearly instruct Ms. Foster not to push and appropriately direct and reinforce that instruction throughout the shoulder-dystocia maneuvers,

i. Upon recognizing shoulder dystocia, carefully follow shoulder dystocia protocol,

j. Refrain from applying excessive downward force with excessive speed at a mal-positioned angle to the head during the second stage of labor,

k. Refrain from applying or allowing excessive traction to be applied during delivery,

l. Refrain from applying or allowing excessive lateral traction upon the fetal head,

m. Refrain from applying or allowing fundal pressure to be applied,

n. Perform appropriate maneuvers in proper order for the appropriate amount of time to relieve shoulder dystocia, and

o. Any other duties that become known.

84. Defendants, THOMAS FASBENDER, D.O. and BRETT ZIMMERMAN, D.O., breached their duties of care by failing to do the following:

a. Monitor the maternal patient and the baby for signs of distress,

b. Identify labor dystocia,

c. Recognize the presence of tachysystole and late decelerations,

d. Identify risk factors for traumatic birth,

e. Discontinue oxytocin,

f. Counsel the patient about the risk of birth injury including shoulder dystocia, and offer the patient the option of cesarean section when risk factors for traumatic birth became known,

g. Timely and appropriately offer and perform cesarean section to prevent birth injury,

h. Comply with any other duties that become known, and

i. Refrain from doing any improper acts that become known.

85. Defendant BRETT ZIMMERMAN, D.O., further breached his duties of care by failing to do the following:

a. Timely recognize shoulder dystocia,

b. Upon recognizing shoulder dystocia, timely and clearly instruct Ms. Foster not to push and appropriately direct and reinforce that instruction throughout the shoulder-dystocia maneuvers,

c. Upon recognizing shoulder dystocia, carefully follow shoulder dystocia protocol,

d. Refrain from applying excessive downward force with excessive speed at a mal-positioned angle to the head during the second stage of labor,

e. Refrain from applying or allowing excessive traction to be applied during delivery,

f. Refrain from applying or allowing excessive lateral traction upon the fetal head,

g. Refrain from applying or allowing fundal pressure to be applied,

h. Perform appropriate maneuvers in proper order for the appropriate amount of time to relieve shoulder dystocia,

i. Comply with any other duties that become known, and

j. Refrain from doing any improper acts that become known.

86. Dr. Fasbender's failures to recognize and respond appropriately to arrest or protraction of labor, tachysystole, and adverse fetal-heart-rate changes allowed a prolonged and traumatic vaginal-delivery attempt to continue when cesarean delivery should have been offered and performed.

87. Timely cesarean delivery would have avoided the subsequent vaginal shoulder dystocia and the forces that caused MB's brachial-plexus injuries.

88. When Dr. Zimmerman assumed care, the labor history, duration of complete dilation and pushing, fetal station and progress, oxytocin exposure, and fetal-heart-rate findings required him to recognize that vaginal delivery presented an unreasonable risk of traumatic delivery and to proceed timely to cesarean section.

89. The record documents delivery of the fetal head at approximately 22:48, recognition of shoulder dystocia, performance of McRoberts positioning and suprapubic pressure, followed by episiotomy, posterior-arm removal and Reverse Woods Corkscrew, and delivery of the body at approximately 22:49.

90. The external TOCO does not display a discernible contraction during that recorded head-to-body interval.

91. If Ms. Foster was instructed not to push and complied, and no effective uterine contraction occurred during the head-to-body interval, improper or excessive clinician-applied traction or manipulation caused or contributed to the stretching, rupture, and avulsion injuries to MB's left brachial plexus.

92. Alternatively, if Ms. Foster continued pushing after shoulder dystocia was recognized because DR. ZIMMERMAN failed to provide, direct, and reinforce a timely and effective instruction to stop pushing—or if continued pushing was permitted or encouraged by the delivery team without correction by DR. ZIMMERMAN—the resulting maternal expulsive force continued while the fetal shoulder remained impacted and the delivery maneuvers were performed, thereby causing or contributing to the brachial-plexus injuries.

93. MB's injuries include, but are not necessarily limited to:

a. Severe left brachial palsy dysfunction,

b. Monoparesis,

c. Spinal root avulsion and/or rupture,

d. The presence of cerebrospinal fluid in the area of C5-C6 and C6-T1,

e. Tendon injury,

f. Nerve injury,

g. Chronic atrophy of her left rotator cuff, deltoid, and biceps muscles,

h. Ongoing neurological problems, pain, and weakness,

i. The need for multiple surgeries,

j. The need for future treatment,

k. Permanent disability and impairment of function, and

l. Any other injuries that are determined throughout the course of discovery.

94. The negligence of Defendants THOMAS FASBENDER, D.O. and BRETT ZIMMERMAN, D.O., proximately caused MB to suffer the aforesaid injuries, entitling her to recover damages, past, present, and future, to compensate her for the following:

a. Physical pain and suffering,

b. Mental anguish,

c. The denial of social pleasure,

d. Embarrassment, fright, humiliation, and mortification,

e. Medical, surgical, and therapeutic expenses,

f. Repayment of medical liens,

g. Loss of earning capacity,

h. Loss of services,

i. Attendant care,

j. Loss of enjoyment of life, and

k. Any other damages that become known or to which she is entitled, including interest, the recovery of allowable costs, and any allowable expert or attorney fees.

95. Defendants SPECTRUM HEALTH and HOLLAND HOSPITAL are each liable for the acts and omissions of their agents, ostensible agents, servants and employees who rendered care to MAHJA FOSTER and MB, including Defendants THOMAS FASBENDER, D.O. and BRETT ZIMMERMAN, D.O., pursuant to the doctrines of vicarious liability and respondeat superior.

WHEREFORE, Plaintiff MAHJA FOSTER, as Next Friend of MB, respectfully requests that this Honorable Court enter judgment in her favor in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00) plus any allowable interest, costs, expert fees, and/or attorney fees.

**COUNT II**
**PROFESSIONAL NEGLIGENCE OF ERIN ELENBAAS, R.N., MICHELLE BROUWER, R.N., EMILY HAND, R.N. and DIANA CONNELL, R.N.**

96. Plaintiff hereby restates and reincorporates each and every allegation set forth in the previous paragraphs of this Complaint as if fully set forth herein.

97. Defendants ERIN ELENBAAS, R.N., MICHELLE BROUWER, R.N., EMILY HAND, R.N. and DIANA CONNELL, R.N., were at all times general practitioners practicing in the field of nursing.

98. Defendants ERIN ELENBAAS, R.N., MICHELLE BROUWER, R.N., EMILY HAND, R.N. and DIANA CONNELL, R.N., were required to provide patients, such as MAHJA FOSTER and MB, with acceptable care under the circumstances, in light of the state of the art existing at the time in the community in which the nurse practiced or in a similar community.

99. Therefore, Defendants ERIN ELENBAAS, R.N., MICHELLE BROUWER, R.N., EMILY HAND, R.N. and DIANA CONNELL, R.N., were required to do for MAHJA FOSTER and MB what a nurse of ordinary learning, judgment or skill would do, under the same or

similar circumstances, in light of the state of the art existing at the time in the community or a similar community, and refrain from doing what a nurse of ordinary learning, judgment, or skill would not do under the same or similar circumstances.

100. When presented with patients like MAHJA FOSTER and MB, the standard of practice or care required Defendants ERIN ELENBAAS, R.N., MICHELLE BROUWER, R.N., EMILY HAND, R.N. and DIANA CONNELL, R.N., to timely and appropriately do all of the following:

a. Appropriately monitor and chart the maternal and fetal labor and delivery process,

b. Identify labor dystocia,

c. Recognize the presence of tachysystole and late decelerations,

d. Comply with the oxytocin package insert and/or PDR including but not limited to avoiding excess uterine activity and/or adverse changes in the fetal condition,

e. Advise the physicians and other health care providers of labor status and advocate for the discontinuance of oxytocin,

f. Advise the physicians and other health care providers of labor status and advocate for the performance of cesarean section to prevent birth injury,

g. Refrain from encouraging a laboring patient from pushing when she is not a candidate for vaginal delivery,

h. Recognize shoulder dystocia and ensure the cessation of pushing,

i. Refrain from applying fundal pressure, or excessive traction,

j. Ensure that shoulder dystocia protocol is followed,

k. Any other duties that become known.

101. Defendants, ERIN ELENBAAS, R.N., MICHELLE BROUWER, R.N., EMILY HAND, R.N. and DIANA CONNELL, R.N., breached their duties of care by failing to do the following:

a. Appropriately monitor and chart the maternal and fetal labor and delivery process,

b. Identify labor dystocia,

c. Recognize the presence of tachysystole and late decelerations,

d. Comply with the oxytocin package insert and/or PDR including but not limited to avoiding excess uterine activity and/or adverse changes in the fetal condition,

e. Advise the physicians and other health care providers of labor status and advocate for the discontinuance of oxytocin,

f. Advise the physicians and other health care providers of labor status and advocate for the performance of cesarean section to prevent birth injury,

g. Comply with any other duties that become known, and

h. Refrain from doing any improper acts that become known.

102. Defendants, EMILY HAND, R.N. and DIANA CONNELL, R.N., further breached their duties of care by failing to do the following:

a. Refrain from encouraging a laboring patient from pushing when she is not a candidate for vaginal delivery,

b. Recognize shoulder dystocia and ensure the cessation of pushing,

c. Refrain from applying fundal pressure, or excessive traction,

d. Ensure that shoulder dystocia protocol is followed,

e. Comply with any other duties that become known, and

f. Refrain from doing any improper acts that become known.

103. Had Defendants, ERIN ELENBAAS, R.N., MICHELLE BROUWER, R.N., EMILY HAND, R.N. and DIANA CONNELL, R.N., complied with the standard of care and recognized that MS. FOSTER was in arrested labor, that MB was in distress, discontinued oxytocin, and advocated for performance of an emergent C-section,

MB would not have experienced shoulder dystocia and she would not have suffered the injuries and damages that she sustained.

104. Had Defendants EMILY HAND, R.N. and DIANA CONNELL, R.N. complied with the standard of care and timely recognized shoulder dystocia, ensured that pushing was stopped and ensured that proper shoulder dystocia protocol was followed, MB would not have sustained severe and permanent injuries, that include but are not limited to the following:

a. Severe left brachial palsy dysfunction,

b. Monoparesis,

c. Spinal root avulsion and/or rupture,

d. The presence of cerebrospinal fluid in the area of C5-C6 and C6-T1,

e. Tendon injury,

f. Nerve injury,

g. Chronic atrophy of her left rotator cuff, deltoid, and biceps muscles,

h. Ongoing neurological problems, pain, and weakness,

i. The need for multiple surgeries,

j. The need for future treatment,

k. Permanent disability and impairment of function, and

l. Any other injuries that are determined throughout the course of discovery.

105. The negligence of Defendants ERIN ELENBAAS, R.N., MICHELLE BROUWER, R.N., EMILY HAND, R.N. and DIANA CONNELL, R.N., proximately caused MB to suffer the aforesaid injuries, entitling her to recover damages, past, present, and future, to compensate her for the following:

a. Physical pain and suffering,

b. Mental anguish,

c. The denial of social pleasure,

d. Embarrassment, fright, humiliation, and mortification,

e. Medical, surgical, and therapeutic expenses,

f. Repayment of medical liens,

g. Loss of earning capacity,

h. Loss of services,

i. Attendant care,

j. Loss of enjoyment of life, and

k. Any other damages that become known or to which she is entitled, including interest, the recovery of allowable costs, and any allowable expert or attorney fees.

106. Defendant HOLLAND HOSPITAL is liable for the acts and omissions of its agents, ostensible agents, servants and employees

who rendered care to MAHJA FOSTER and MB, including Defendants ERIN ELENBAAS, R.N., MICHELLE BROUWER, R.N., EMILY HAND, R.N. and DIANA CONNELL, R.N., pursuant to the doctrines of vicarious liability and respondeat superior.

WHEREFORE, Plaintiff MAHJA FOSTER, as Next Friend of MB, respectfully requests that this Honorable Court enter judgment in her favor in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00) plus any allowable interest, costs, expert fees, and/or attorney fees.

## COUNT III
## PROFESSIONAL NEGLIGENCE OR ORDINARY NEGLIGENCE OF SPECTRUM HEALTH

107. Plaintiff hereby restates and reincorporates each and every allegation set forth in the previous paragraphs of this Complaint as if fully set forth herein.

108. In treating MAHJA FOSTER and MB, the SPECTRUM HEALTH defendants were required to provide the recognized standard of practice or care as that of the skill and care ordinarily possessed and exercised by a health care facility in the same or similar localities. The applicable standard of practice or care

required the SPECTRUM HEALTH defendants, at a minimum, to do all of the following:

a. Select, screen, train, and employ only qualified personnel,

b. Provide MAHJA FOSTER and MB with proper medical care based on the known and/or available medical history,

c. Employ or contract with physicians, residents, nurses, physician assistants, and/or staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar localities,

d. Adequately supervise, direct, monitor, and control these healthcare providers so as to safeguard patients such MAHJA FOSTER and MB,

e. Draft, promulgate, adopt, and/or enforce appropriate rules, regulations, policies, and procedures, which would enable and engender its healthcare providers, including but not limited to, its physicians, to render appropriate and timely treatment to patients looking for said treatment,

f. Accurately and completely document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, history and physical, discharge summary, shoulder dystocia documentation, operative reports, history and physical, and plan of care,

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

   i. Interpretation of fetal heart monitor tracings,

ii. Informed consent to the patient regarding the risks and potential complications of oxytocin induction and augmentation of labor,

iii. Informed consent to the patient regarding the risks and potential complications related to labor dystocia and shoulder dystocia,

iv. Management of oxytocin induction/augmentation of labor, and

v. Shoulder dystocia management, and documentation,

h. Any other duties that have yet to be determined and become known throughout the course of discovery.

109. At all times relevant to the care and treatment of MAHJA FOSTER and MB, the SPECTRUM HEALTH defendants failed in all respects to comply with the applicable standard of care and were, therefore, professionally negligent, and/or negligent.

110. Had the SPECTRUM HEALTH defendants complied with the applicable standard of care, MB would not have sustained the severe and permanent injuries, that include but are not limited to the following:

a. Severe left brachial palsy dysfunction,

b. Monoparesis,

c. Spinal root avulsion and/or rupture,

d. The presence of cerebrospinal fluid in the area of C5-C6 and C6-T1,

e. Tendon injury,

f. Nerve injury,

g. Chronic atrophy of her left rotator cuff, deltoid, and biceps muscles,

h. Ongoing neurological problems, pain, and weakness,

i. The need for multiple surgeries,

j. The need for future treatment,

k. Permanent disability and impairment of function, and

l. Any other injuries that are determined throughout the course of discovery.

111. The negligence of the SPECTRUM HEALTH defendants proximately caused MB to suffer the aforesaid injuries, entitling her to recover damages, past, present, and future, to compensate her for the following:

a. Physical pain and suffering,

b. Mental anguish,

c. The denial of social pleasure,

d. Embarrassment, fright, humiliation, and mortification,

e. Medical, surgical, and therapeutic expenses,

f. Repayment of medical liens,

g. Loss of earning capacity,

h. Loss of services,

i. Attendant care,

j. Loss of enjoyment of life, and

k. Any other damages that become known or to which she is entitled, including interest, the recovery of allowable costs, and any allowable expert or attorney fees.

112. The SPECTRUM HEALTH defendants are liable for the acts and omissions of their agents, ostensible agents, servants and employees who rendered care and treatment to MAHJA FOSTER and MB, including but not limited to, THOMAS FASBENDER, D.O. and BRETT T. ZIMMERMAN, D.O. and all other hitherto unidentified physicians, RNs, LPNs, nursing assistants, and patient care technicians, pursuant to the doctrines of vicarious liability and/or respondeat superior.

WHEREFORE, Plaintiff MAHJA FOSTER, as Next Friend of MB, respectfully requests that this Honorable Court enter judgment in her favor in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00) plus any allowable interest, costs, expert fees, and/or attorney fees.

**COUNT IV**
**PROFESSIONAL NEGLIGENCE OF**
**HOLLAND HOSPITAL**

113. Plaintiff hereby restates and reincorporates each and every allegation set forth in the previous paragraphs of this Complaint as if fully set forth herein.

114. In treating MAHJA FOSTER and MB, HOLLAND HOSPITAL was required to provide the recognized standard of practice or care as that of the skill and care ordinarily possessed and exercised by a health care facility in the same or similar localities. The applicable standard of practice or care required HOLLAND HOSPITAL, at a minimum, to do all of the following:

a. Select, screen, train, and employ only qualified personnel,

b. Provide MAHJA FOSTER and MB with proper medical care based on the known and/or available medical history,

c. Employ or contract with physicians, residents, nurses, physician assistants, and/or staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar localities,

d. Adequately supervise, direct, monitor, and control these healthcare providers so as to safeguard patients such as MAHJA FOSTER and MB,

e. Draft, promulgate, adopt, and/or enforce appropriate rules, regulations, policies, and procedures, which would enable and engender its healthcare providers, including but not limited to, its physicians, to render appropriate and timely treatment to patients looking for said treatment,

f. Accurately and completely document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, history and physical, discharge summary, shoulder dystocia documentation, operative reports, history and physical, and plan of care,

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

i. Interpretation of fetal heart monitor tracings,

ii. Informed consent to the patient regarding the risks and potential complications of oxytocin induction and augmentation of labor,

iii. Informed consent to the patient regarding the risks and potential complications related to labor dystocia and shoulder dystocia,

iv. Management of oxytocin induction/augmentation of labor, and

v. Shoulder dystocia management, and documentation,

vi. Any other duties that have yet to be determined and become known throughout the course of discovery.

115. At all times relevant to the care and treatment of MAHJA FOSTER and MB, Defendant HOLLAND HOSPITAL failed in all respects to comply with the applicable standard of care and was, therefore, professionally negligent, and/or negligent.

116. Had Defendant HOLLAND HOSPITAL complied with the applicable standard of care, MB would not have sustained the severe and permanent injuries, that include but are not limited to the following:

a. Severe left brachial palsy dysfunction,

b. Monoparesis,

c. Spinal root avulsion and/or rupture,

d. The presence of cerebrospinal fluid in the area of C5-C6 and C6-T1,

e. Tendon injury,

f. Nerve injury,

g. Chronic atrophy of her left rotator cuff, deltoid, and biceps muscles,

h. Ongoing neurological problems, pain, and weakness,

i. The need for multiple surgeries,

j. The need for future treatment,

k. Permanent disability and impairment of function, and

l. Any other injuries that are determined throughout the course of discovery.

117. The negligence of Defendant HOLLAND HOSPITAL proximately caused MB to suffer the aforesaid injuries, entitling her to recover damages, past, present, and future, to compensate her for the following:

a. Physical pain and suffering,

b. Mental anguish,

c. The denial of social pleasure,

d. Embarrassment, fright, humiliation, and mortification,

e. Medical, surgical, and therapeutic expenses,

f. Repayment of medical liens,

g. Loss of earning capacity,

h. Loss of services,

i. Attendant care,

j. Loss of enjoyment of life, and

k. Any other damages that become known or to which she is entitled, including interest, the recovery of allowable costs, and any allowable expert or attorney fees.

118. Defendant HOLLAND HOSPITAL is liable for the acts and omissions of its agents, ostensible agents, servants and employees who rendered care and treatment to MAHJA FOSTER and MB,

including but not limited to, THOMAS FASBENDER, D.O., BRETT T. ZIMMERMAN, D.O., ERIN ELENBAAS, R.N., MICHELLE BROUWER, R.N., EMILY HAND, R.N. and DIANA CONNELL, R.N., and all other hitherto unidentified physicians, RNs, LPNs, nursing assistants, and patient care technicians, pursuant to the doctrines of vicarious liability and/or respondeat superior.

WHEREFORE, Plaintiff MAHJA FOSTER, as Next Friend of MB, respectfully requests that this Honorable Court enter judgment in her favor in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00) plus any allowable interest, costs, expert fees, and/or attorney fees.

Respectfully submitted,

*/s/ Gary N. Felty, Jr.*

GARY N. FELTY, JR. (P55554)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorney for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan 48075
(248) 355-5555
g.felty@fiegerlaw.com

Dated: 10/16/2026

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAHJA FOSTER, as Next Friend of MB, a minor,

Plaintiff,

Case No.: ___________
Hon. ________________

vs.

SPECTRUM HEALTH SYSTEM d/b/a SPECTRUM HEALTH; SPECTRUM HEALTH PRIMARY PARTNERS d/b/a SPECTRUM HEALTH MEDICAL GROUP, SPECTRUM HEALTH MEDICAL GROUP – OBSTETRICS AND GYNECOLOGY, COREWELL HEALTH OBSTETRICS & GYNECOLOGY – LAKEWOOD; HOLLAND COMMUNITY HOSPITAL d/b/a HOLLAND HOSPITAL; THOMAS FASBENDER, D.O.; BRETT ZIMMERMAN, D.O.; MICHELLE BROUWER, R.N.; ERIN ELENBAAS, R.N.; EMILY HAND, R.N.; and DIANA CONNELL, R.N.,

Defendants.

---

JAMES J. HARRINGTON, IV (P65351)
GARY N. FELTY, JR. (P55554)
Attorneys for Plaintiff
Fieger, Fieger, Kenney & Harrington, P.C.
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555
Fax: (248) 355-5148
g.felty@fiegerlaw.com

---

**PLAINTIFF'S DEMAND FOR TRIAL BY JURY**

NOW COMES, MAHJA FOSTER, AS NEXT FRIEND OF MB, A MINOR, by and through her attorneys, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., and hereby requests trial by jury in this matter.

Respectfully submitted,

*/s/ Gary N. Felty, Jr.*

GARY N. FELTY, JR. (P55554)
JAMES J. HARRINGTON, IV (P65351)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorney for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan 48075
(248) 355-5555
g.felty@fiegerlaw.com

Dated: October 16, 2026

# EXHIBIT "1"

**AFFIDAVIT OF MERITORIOUS CLAIM OF JEFFREY SOFFER, M.D., FACOG**

**RE: MAHJA FOSTER (DOB: 8/26/1996) and her minor child, MB (DOB: 11/4/2016)**

STATE OF NEW JERSEY )
)
UNION COUNTY )

JEFFREY SOFFER, M.D., FACOG, after being duly sworn, deposes and states as follows:

1. At the time of executing this document, I am physically located in the State of New Jersey.

2. I am a physician specializing in obstetrics and gynecology.

3. I received my M.D. degree from Howard University College of Medicine, completed residency training in obstetrics and gynecology at the Hospital of the University of Pennsylvania, and am certified by the American Board of Obstetrics and Gynecology.

4. At all material times, I was licensed to practice medicine in the state of New Jersey.

5. It is my understanding that Thomas Fasbender, D.O. and Brett T. Zimmerman, D.O. were physicians specializing in obstetrics and gynecology who provided prenatal, labor, and/or delivery care to Mahja Foster and MB, and that the care at issue was provided on behalf of and/or in connection with Holland Community Hospital d/b/a Holland Hospital and Spectrum Health Medical Group and its related or successor obstetrical entities identified in the Notice of Intent, Amended Notice of Intent, and Plaintiff's Complaint. When I refer to "Spectrum Health," I am referring to those entities.

6. During the one-year period immediately preceding November 4, 2016, I devoted a majority of my professional time to the active clinical practice of obstetrics and gynecology.

7. I was, at all material times, board certified by the American Board of Obstetrics & Gynecology.

8. I have reviewed Plaintiff's Notice of Intent to File a Claim, Plaintiff's Amended Notice of Intent to File a Claim, and Plaintiff's proposed Complaint.

9. I have reviewed all medical records supplied to me concerning the allegations in the Notice of Intent, Amended Notice of Intent, and the proposed Complaint, that include the following:

a. Prenatal records of Spectrum Health,

b. Labor & Delivery Records from Holland Hospital,

c. Fetal monitoring strips from Holland Hospital,

d. Mary Free Bed,

e. Molly Diaz, M.D. / Erie Division Street Health Care,

f. University of Michigan / Mott Children's Hospital,

g. DeVos Children's Hospital,

h. Lurie Children's Hospital, and

i. Children's Hospital of Philadelphia.

10. I have received sufficient factual information to offer opinions regarding whether Dr. Fasbender, Dr. Zimmerman, Spectrum Health, and Holland Hospital deviated from the standard of care and proximately caused injury to MB.

11. It is my opinion to a reasonable degree of medical certainty that Thomas Fasbender, D.O., Brett T. Zimmerman, D.O., Spectrum Health, and Holland Hospital deviated from the standard of care and proximately caused the injuries sustained by MB.

## I. <u>THE APPLICABLE STANDARD OF CARE OR PRACTICE</u>

12. The applicable standard of practice or care required Thomas Fasbender, D.O., Brett T. Zimmerman, D.O., and any physicians, residents, or other medical professionals under their supervision to provide the care that an obstetrician of ordinary learning, judgment, and skill would provide under the same or similar circumstances, and to refrain from conduct that such an obstetrician would not do under the same or similar circumstances. Specifically, the standard of care required them to timely and appropriately:

a. Monitor the maternal patient and the baby for signs of distress,

b. Identify labor dystocia,

c. Recognize tachysystole and late decelerations,

d. Identify risk factors for traumatic birth,

e. Discontinue oxytocin when indicated by excessive uterine activity and/or adverse fetal changes,

f. Counsel the patient regarding the risk of birth injury, including shoulder dystocia, and offer cesarean section when risk factors for traumatic birth became known,

g. Timely and appropriately offer and perform cesarean section to prevent birth injury,

h. Recognize shoulder dystocia; and upon recognizing shoulder dystocia, timely and clearly instruct Ms. Foster not to push and appropriately direct and reinforce that instruction throughout the shoulder dystocia maneuvers,

i. Refrain from applying excessive downward force with inappropriate speed at a mal-positioned angle to the fetal head during the second stage of labor,

j. Refrain from applying or allowing excessive traction or excessive lateral traction to the fetal head during delivery,

k. Refrain from applying or allowing fundal pressure,

l. Perform appropriate shoulder-dystocia maneuvers in proper order for an appropriate amount of time, and

m. Any other duties found through the discovery process.

13. The standard of care or practice applicable to Spectrum Health's obstetrical and gynecological practice is that of a reasonable and prudent medical facility. At minimum, Spectrum Health's gynecological and obstetrical practice, through its agents and employees, had a duty to provide the physician, professional nursing, health professional, technical and supportive personnel, and the technical, diagnostic, and treatment services and equipment necessary to assure the safe performance of its obstetrical and gynecological practice pursuant to MCL 333.20141. It was required to:

a. Select, screen, train, and employ only qualified personnel,

b. Provide its patients proper medical care,

c. Employ or contract with physicians, residents, and nursing staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar locality,

d. Adequately supervise, direct, monitor and control their healthcare providers,

e. Truthfully and accurately document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, history and physical, discharge summary, shoulder dystocia documentation, operative reports, admission and physical examination and plan of care;

f. Retain a full and complete legible copy of the medical record, and maintain and provide proper and adequate documentation including but not limited to progress notes, history and physical, discharge summary, operative reports, shoulder dystocia documentation, admission and physical,

plan of care regarding notification of physicians, nurses and staff for assessment and treatment, audit trails, audit logs, and revisions histories;

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

i. Interpretation of fetal heart monitor tracings,

ii. Informed consent to the patient regarding the risks and potential complications of oxytocin induction/augmentation of labor,

iii. Informed consent to the patient regarding the risks and potential complications related to shoulder dystocia,

iv. Management of oxytocin induction/augmentation of labor,

v. Maintenance/preservation of a patient's medical chart,

vi. Obstetrician staffing on L&D floor,

vii. Shoulder dystocia documentation,

viii. Shoulder dystocia management, and

ix. Any other duties found through the discovery process.

14. The standard of care or practice applicable to Holland Hospital is that of a reasonable and prudent hospital. At minimum, Holland Hospital's department of gynecology and obstetrics, through its agents and employees, had duties pursuant to MCL §333.21513 to:

a. Select, screen, train, and employ only qualified personnel,

b. Provide its patients proper medical care,

c. Employ or contract with physicians, residents, and nursing staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar locality,

d. Adequately supervise, direct, monitor and control their healthcare providers,

e. Truthfully and accurately document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, history and physical, discharge summary, shoulder dystocia documentation, operative reports, admission and physical examination and plan of care;

f. Retain a full and complete legible copy of the medical record, and maintain and provide proper and adequate

documentation including but not limited to progress notes, history and physical, discharge summary, operative reports, shoulder dystocia documentation, admission and physical examination, plan of care regarding notification of physicians, nurses and staff for assessment and treatment, audit trails, audit logs, and revisions histories;

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

i. Interpretation of fetal heart monitor tracings,

ii. Informed consent to the patient regarding the risks and potential complications of oxytocin induction/augmentation of labor,

iii. Informed consent to the patient regarding the risks and potential complications related to shoulder dystocia,

iv. Management of oxytocin induction/augmentation of labor,

v. Maintenance/preservation of a patient's medical chart,

vi. Obstetrician staffing on L&D floor,

vii. Shoulder dystocia documentation,

viii. Shoulder dystocia management, and

ix. Any other duties found through the discovery process.

## II. <u>THE APPLICABLE STANDARD OF CARE WAS BREACHED</u>

15. It is my professional opinion to a reasonable degree of medical certainty that Thomas Fasbender, D.O. and Brett T. Zimmerman, D.O., breached the applicable standard of care in the following manners:

a. Failing to monitor the maternal patient and the baby for signs of distress,

b. Failing to identify labor dystocia,

c. Failing to recognize the presence of tachysystole and late decelerations,

d. Failing to identify risk factors for traumatic birth,

e. Failing to discontinue oxytocin when indicated,

f. Failing to counsel the patient about the risk of birth injury, including shoulder dystocia, and failing to offer cesarean section when risk factors for traumatic birth became known;

g. Failing to timely and appropriately offer and perform cesarean section to prevent birth injury, and

h. Any other act or omission determined during discovery.

16. It is further my opinion that Brett T. Zimmerman, D.O., additionally breached the standard of care in the following manners:

a. Failing to recognize shoulder dystocia, and upon recognizing shoulder dystocia, timely and clearly instruct Ms. Foster not to push and appropriately direct and reinforce that instruction throughout the shoulder dystocia maneuvers,

b. Applying and/or allowing excessive downward force with inappropriate speed at a mal-positioned angle to the fetal head during the second stage of labor,

c. Applying and/or allowing excessive traction during delivery,

d. Applying and/or allowing excessive lateral traction upon the fetal head,

e. Applying and/or allowing fundal pressure,

f. Failing to perform appropriate maneuvers in proper order for the appropriate amount of time to relieve shoulder dystocia, and

g. Any other act or omission determined during discovery.

17. Spectrum Health breached the applicable standard of practice or care when it negligently failed to do the following:

a. Select, screen, train, and employ only qualified personnel,

b. Provide MB proper medical care,

c. Employ or contract with physicians, residents, and nursing staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar locality,

d. Adequately supervise, direct, monitor and control these healthcare providers,

e. Truthfully and accurately document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, history and physical, discharge summary, shoulder dystocia documentation, operative reports, history and physical examination and plan of care,

f. Retain a full and complete legible copy of the medical record, and maintain and provide proper and adequate documentation including but not limited to progress notes, history and physical, discharge summary, operative reports,

shoulder dystocia documentation, history and physical examination, plan of care regarding notification of physicians, nurses and staff for assessment and treatment, audit trails, audit logs, and revisions histories,

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

   i. Interpretation of fetal heart monitor tracings,

   ii. Informed consent to the patient regarding the risks and potential complications of Pitocin induction/augmentation of labor,

   iii. Informed consent to the patient regarding the risks and potential complications related to shoulder dystocia,

   iv. Management of Pitocin induction/augmentation of labor,

   v. Maintenance/preservation of a patient's medical chart,

   vi. Obstetrician staffing on L&D floor,

   vii. Shoulder dystocia documentation,

   viii. Shoulder dystocia management, and

h. Any other act or omission determined during discovery.

18. Holland Hospital breached the applicable standard of practice or care when it negligently failed to do the following:

a. Select, screen, train, and employ only qualified personnel,

b. Provide MB proper medical care,

c. Employ or contract with physicians, residents, and nursing staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar locality,

d. Adequately supervise, direct, monitor and control these healthcare providers,

e. Truthfully and accurately document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, admission history and physical examination, discharge summary, shoulder dystocia documentation, operative reports, admission and physical and plan of care,

f. Retain a full and complete legible copy of the medical record, and maintain and provide proper and adequate documentation including but not limited to progress notes,

history and physical examination, discharge summary, operative reports, shoulder dystocia documentation, plan of care regarding notification of physicians, nurses and staff for assessment and treatment, audit trails, audit logs, and revisions histories,

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

   i. Interpretation of fetal heart monitor tracings,

   ii. Informed consent to the patient regarding the risks and potential complications of Pitocin induction/augmentation of labor,

   iii. Informed consent to the patient regarding the risks and potential complications related to shoulder dystocia,

   iv. Management of Pitocin induction/augmentation of labor,

   v. Maintenance/preservation of a patient's medical chart,

   vi. Obstetrician staffing on L&D floor,

   vii. Shoulder dystocia documentation,

   viii. Shoulder dystocia management, and

h. Any other act or omission determined during discovery.

## III. <u>THE ACTIONS THAT SHOULD HAVE BEEN TAKEN OR OMITTED BY THE HEALTHCARE PROFESSIONALS AND FACILITIES IN ORDER TO HAVE COMPLIED WITH THE APPLICABLE STANDARD OF CARE OR PRACTICE</u>

19. To comply with the applicable standard of care, Dr. Fasbender and Dr. Zimmerman should have timely and appropriately done the following:

a. Monitor the maternal patient and the baby for signs of distress,

b. Identify labor dystocia,

c. Recognize the presence of tachysystole and late decelerations,

d. Identify risk factors for traumatic birth,

e. Discontinue oxytocin,

f. Counsel the patient about the risk of birth injury, including shoulder dystocia, and offer the patient the option of cesarean section when risk factors for traumatic birth became known,

g. Timely and appropriately offer and perform cesarean section to prevent birth injury,

h. Recognize shoulder dystocia, and upon recognizing shoulder dystocia, timely and clearly instruct Ms. Foster not to push and appropriately direct and reinforce that instruction throughout the shoulder dystocia maneuvers,

i. Refrain from applying excessive downward force with inappropriate speed at a mal-positioned angle to the fetal head during the second stage of labor,

j. Refrain from applying or allowing excessive traction to be applied during delivery,

k. Refrain from applying or allowing excessive lateral traction upon the fetal head,

l. Refrain from applying or allowing fundal pressure to be applied,

m. Perform appropriate maneuvers in proper order for the appropriate amount of time to relieve shoulder dystocia,

n. Perform any additional actions that become known throughout discovery, and

o. Omit from doing any improper actions that become known throughout discovery.

20. In order to achieve compliance with the standard of care, Spectrum Health should have timely and appropriately done the following:

a. Select, screen, train, and employ only qualified personnel,

b. Provide MB proper medical care,

c. Employ or contract with physicians, residents, and nursing staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar locality,

d. Adequately supervise, direct, monitor and control these healthcare providers,

e. Truthfully and accurately document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, history and physical, discharge summary, shoulder dystocia documentation, operative reports, history and physical examination and plan of care,

f. Retain a full and complete legible copy of the medical record, and maintain and provide proper and adequate documentation including but not limited to progress notes, history and physical, discharge summary, operative reports, shoulder dystocia documentation, history and physical examination, plan of care regarding notification of physicians, nurses and staff for assessment and treatment, audit trails, audit logs, and revisions histories,

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

i. Interpretation of fetal heart monitor tracings,

ii. Informed consent to the patient regarding the risks and potential complications of Pitocin induction/augmentation of labor,

iii. Informed consent to the patient regarding the risks and potential complications related to shoulder dystocia,

iv. Management of Pitocin induction/augmentation of labor,

v. Maintenance/preservation of a patient's medical chart,

vi. Obstetrician staffing on L&D floor,

vii. Shoulder dystocia documentation,

viii. Shoulder dystocia management, and

h. Perform any additional actions that become known throughout discovery, and

i. Omit from doing any improper actions that become known throughout discovery.

21. In order to achieve compliance with the standard of care, Holland Hospital should have timely and appropriately done the following:

a. Select, screen, train, and employ only qualified personnel,

b. Provide MB proper medical care,

c. Employ or contract with physicians, residents, and nursing staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar locality,

d. Adequately supervise, direct, monitor and control these healthcare providers,

e. Truthfully and accurately document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, history and physical, discharge summary, shoulder dystocia documentation, operative reports, history and physical examination and plan of care,

f. Retain a full and complete legible copy of the medical record, and maintain and provide proper and adequate documentation including but not limited to progress notes, history and physical, discharge summary, operative reports, shoulder dystocia documentation, history and physical examination, plan of care regarding notification of physicians, nurses and staff for assessment and treatment, audit trails, audit logs, and revisions histories,

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

   i. Interpretation of fetal heart monitor tracings,

   ii. Informed consent to the patient regarding the risks and potential complications of Pitocin induction/augmentation of labor,

   iii. Informed consent to the patient regarding the risks and potential complications related to shoulder dystocia,

   iv. Management of Pitocin induction/augmentation of labor,

   v. Maintenance/preservation of a patient's medical chart,

   vi. Obstetrician staffing on L&D floor,

   vii. Shoulder dystocia documentation,

   viii. Shoulder dystocia management,

h. Perform any additional actions that become known throughout discovery, and

i. Omitt from doing any improper actions that become known throughout discovery.

## IV. <u>PROXIMATE CAUSE AND INJURY</u>

22. As a direct and proximate result of the foregoing breaches by Thomas Fasbender, D.O. and Brett T. Zimmerman, D.O., MB was exposed to prolonged labor and traumatic vaginal delivery, including severe shoulder dystocia. Had cesarean section been timely performed, she would not have experienced shoulder dystocia and suffered the injuries that resulted. Had

shoulder dystocia been properly managed by Dr. Zimmerman and dystocia protocol been followed, the injuries would not have occurred.

23. Dr. Fasbender's failures to recognize and respond appropriately to arrest or protraction of labor, tachysystole, and adverse fetal heart-rate changes allowed a prolonged and traumatic vaginal delivery attempt to continue when cesarean delivery should have been offered and performed. Timely cesarean delivery would have avoided the subsequent vaginal shoulder dystocia and the forces that caused MB's brachial plexus injuries.

24. When Dr. Zimmerman assumed care, the labor history, duration of complete dilation and pushing, fetal station and progress, oxytocin exposure, and fetal-heart-rate findings required him to recognize that vaginal delivery presented an unreasonable risk of traumatic delivery and to proceed timely to cesarean section. His failure to do so permitted the vaginal delivery to continue and resulted in the subsequent shoulder dystocia and the forces that caused MB's injuries.

25. Regarding shoulder dystocia management, the record documents delivery of the fetal head at approximately 22:48, recognition of shoulder dystocia, performance of McRoberts positioning and suprapubic pressure, followed by episiotomy, posterior-arm removal and Reverse Woods corkscrew, and delivery of the body at approximately 22:49. The external TOCO does not display a discernible contraction during that recorded head-to-body interval.

26. If Ms. Foster was instructed not to push and complied, and no effective uterine contraction occurred during the head-to-body interval, improper or excessive clinician-applied traction or manipulation caused or contributed to the stretching, rupture, and avulsion injuries to MB's left brachial plexus.

27. Alternatively, if Ms. Foster continued pushing after shoulder dystocia was recognized because Dr. Zimmerman failed to provide, direct, and reinforce a timely and effective instruction to stop pushing—or if continued pushing was permitted or encouraged by the delivery team without correction by Dr. Zimmerman—the resulting maternal expulsive force continued while the fetal shoulder remained impacted and the delivery maneuvers were performed, thereby causing or contributing to the brachial-plexus injuries.

28. Spectrum Health's failure to adopt, implement, and enforce appropriate obstetrical policies and training concerning recognition of labor arrest, response to tachysystole and adverse fetal-heart-rate changes, timely escalation to cesarean delivery, and management of shoulder dystocia resulted in its agents' failure to perform a timely cesarean delivery and/or their improper management of the shoulder dystocia. Those failures exposed MB to the impaction and forces that caused her brachial-plexus injuries.

29. Holland Hospital's failure to adopt, implement, and enforce appropriate obstetrical policies and training concerning recognition of labor arrest, response to tachysystole and adverse fetal-heart-rate changes, timely escalation to cesarean delivery, and management of shoulder dystocia resulted in its agents' failure to perform a timely cesarean delivery and/or their improper management of the shoulder dystocia. Those failures exposed MB to the impaction and forces that caused her brachial-plexus injuries.

30. The injuries proximately caused by the aforementioned breaches resulted in injury and damages that include, but are not limited to: Severe left brachial palsy dysfunction, monoparesis, spinal root avulsion or rupture, the presence of cerebrospinal fluid in the area of C5-C6 and C6-T1, tendon injury, nerve injury, chronic atrophy of her left rotator cuff, deltoid, and biceps muscles, ongoing neurological problems, pain, weakness, the need for multiple surgeries, the need for future surgeries, permanent disability, and loss of earning capacity.

31. I swear or affirm that the foregoing statements are true and accurate, to the best of my knowledge and belief.

32. My opinions are preliminary because I have not reviewed any deposition testimony and may not have reviewed complete medical records.

33. I therefore reserve my right to amend or supplement my opinions after reviewing additional materials that may become available.

JEFFREY SOFFER, M.D., FACOG

Signed and sworn (or affirmed) to before me on Sept 26th 2026 (Date) by Jeffry Soffer (Name of Person Making Statement).

Signature of Notary Public

REKASH PURAN
NOTARY PUBLIC
STATE OF NEW JERSEY
ID #50155525
MY COMMISSION EXPIRES MARCH 22, 2031

(Seal)

Title or Rank

My Commission Expires: 03/22/2031

# EXHIBIT "2"

**AFFIDAVIT OF MERITORIOUS CLAIM OF FRED J. DUBOE, M.D.,**

**RE: MAHJA FOSTER (DOB: 8/26/1996) and her minor child, MB (DOB: 11/4/2016)**

STATE OF ILLINOIS )
)
LAKE COUNTY )

FRED J. DUBOE, M.D., after being duly sworn, deposes and states as follows:

1. At the time of executing this document, I am physically located in the State of Illinois.

2. I am a physician who specialized in obstetrics and gynecology at all material times.

3. I received my M.D. degree from the University of Illinois/Abraham Lincoln School of Medicine, completed residency training in obstetrics and gynecology at Northwestern University Medical School/Northwestern Memorial Hospital and Prentice Women's Hospital and Maternity Center, and am certified by the American Board of Obstetrics and Gynecology.

4. At all material times, I was licensed to practice medicine in the state of Illinois.

5. It is my understanding that Thomas Fasbender, D.O. and Brett T. Zimmerman, D.O. were physicians specializing in obstetrics and gynecology who provided prenatal, labor, and/or delivery care to Mahja Foster and MB, and that the care at issue was provided on behalf of and/or in connection with Holland Community Hospital d/b/a Holland Hospital and Spectrum Health Medical Group and its related or successor obstetrical entities identified in the Notice of Intent, Amended Notice of Intent, and Plaintiff's Complaint. When I refer to "Spectrum Health," I am referring to those entities.

6. During the one-year period immediately preceding November 4, 2016, I devoted a majority of my professional time to the active clinical practice of obstetrics and gynecology.

7. I was, at all material times, board certified by the American Board of Obstetrics & Gynecology.

8. I continue to consult and maintain my licensure and board certification.

9. I have reviewed Plaintiff's Notice of Intent to File a Claim, Plaintiff's Amended Notice of Intent to File a Claim, and Plaintiff's proposed Complaint.

10. I have reviewed all medical records supplied to me concerning the allegations in the Notice of Intent, Amended Notice of Intent, and the proposed Complaint, that include the following:

a. Prenatal records of Spectrum Health,

b. Labor & Delivery Records from Holland Hospital,

c. Fetal monitoring strips from Holland Hospital,

d. Mary Free Bed,

e. Molly Diaz, M.D. / Erie Division Street Health Care,

f. University of Michigan / Mott Children's Hospital,

g. DeVos Children's Hospital,

h. Lurie Children's Hospital, and

i. Children's Hospital of Philadelphia.

11. I have received sufficient factual information to offer opinions regarding whether Dr. Fasbender, Dr. Zimmerman, Spectrum Health, and Holland Hospital deviated from the standard of care and proximately caused injury to MB.

12. It is my opinion to a reasonable degree of medical certainty that Thomas Fasbender, D.O., Brett T. Zimmerman, D.O., Spectrum Health, and Holland Hospital deviated from the standard of care and proximately caused the injuries sustained by MB.

## I. THE APPLICABLE STANDARD OF CARE OR PRACTICE

13. The applicable standard of practice or care required Thomas Fasbender, D.O., Brett T. Zimmerman, D.O., and any physicians, residents, or other medical professionals under their supervision to provide the care that an obstetrician of ordinary learning, judgment, and skill would provide under the same or similar circumstances, and to refrain from conduct that such an obstetrician would not do under the same or similar circumstances. Specifically, the standard of care required them to timely and appropriately:

a. Monitor the maternal patient and the baby for signs of distress,

b. Identify labor dystocia,

c. Recognize tachysystole and late decelerations,

d. Identify risk factors for traumatic birth,

e. Discontinue oxytocin when indicated by excessive uterine activity and/or adverse fetal changes,

f. Counsel the patient regarding the risk of birth injury, including shoulder dystocia, and offer cesarean section when risk factors for traumatic birth became known,

g. Timely and appropriately offer and perform cesarean section to prevent birth injury,

h. Recognize shoulder dystocia; and upon recognizing shoulder dystocia, timely and clearly instruct Ms. Foster not to push and appropriately direct and reinforce that instruction throughout the shoulder dystocia maneuvers,

i. Refrain from applying or allowing excessive traction or excessive lateral traction to the fetal head during delivery,

j. Refrain from applying or allowing fundal pressure,

k. Perform appropriate shoulder-dystocia maneuvers in proper order for an appropriate amount of time, and

l. Any other duties found through the discovery process.

14. The standard of care or practice applicable to Spectrum Health's obstetrical and gynecological practice is that of a reasonable and prudent medical facility. At minimum, Spectrum Health's gynecological and obstetrical practice, through its agents and employees, had a duty to provide the physician, professional nursing, health professional, technical and supportive personnel, and the technical, diagnostic, and treatment services and equipment necessary to assure the safe performance of its obstetrical and gynecological practice pursuant to MCL 333.20141. It was required to:

a. Select, screen, train, and employ only qualified personnel,

b. Provide its patients proper medical care,

c. Employ or contract with physicians, residents, and nursing staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar locality,

d. Adequately supervise, direct, monitor and control their healthcare providers,

e. Truthfully and accurately document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, history and physical, discharge summary, shoulder dystocia documentation, operative reports, admission and physical examination and plan of care;

f. Retain a full and complete legible copy of the medical record, and maintain and provide proper and adequate documentation including but not limited to progress notes,

history and physical, discharge summary, operative reports, shoulder dystocia documentation, admission and physical, plan of care regarding notification of physicians, nurses and staff for assessment and treatment, audit trails, audit logs, and revisions histories;

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

i. Interpretation of fetal heart monitor tracings,

ii. Informed consent to the patient regarding the risks and potential complications of oxytocin induction/augmentation of labor,

iii. Informed consent to the patient regarding the risks and potential complications related to shoulder dystocia,

iv. Management of oxytocin induction/augmentation of labor,

v. Maintenance/preservation of a patient's medical chart,

vi. Obstetrician staffing on L&D floor,

vii. Shoulder dystocia documentation,

viii. Shoulder dystocia management, and

ix. Any other duties found through the discovery process.

15. The standard of care or practice applicable to Holland Hospital is that of a reasonable and prudent hospital. At minimum, Holland Hospital's department of gynecology and obstetrics, through its agents and employees, had duties pursuant to MCL §333.21513 to:

a. Select, screen, train, and employ only qualified personnel,

b. Provide its patients proper medical care,

c. Employ or contract with physicians, residents, and nursing staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar locality,

d. Adequately supervise, direct, monitor and control their healthcare providers,

e. Truthfully and accurately document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, history and physical, discharge summary, shoulder dystocia documentation, operative reports, admission and physical examination and plan of care;

f. Retain a full and complete legible copy of the medical record, and maintain and provide proper and adequate documentation including but not limited to progress notes, history and physical, discharge summary, operative reports, shoulder dystocia documentation, admission and physical examination, plan of care regarding notification of physicians, nurses and staff for assessment and treatment, audit trails, audit logs, and revisions histories;

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

   i. Interpretation of fetal heart monitor tracings,

   ii. Informed consent to the patient regarding the risks and potential complications of oxytocin induction/augmentation of labor,

   iii. Informed consent to the patient regarding the risks and potential complications related to shoulder dystocia,

   iv. Management of oxytocin induction/augmentation of labor,

   v. Maintenance/preservation of a patient's medical chart,

   vi. Obstetrician staffing on L&D floor,

   vii. Shoulder dystocia documentation,

   viii. Shoulder dystocia management, and

   ix. Any other duties found through the discovery process.

## II. <u>THE APPLICABLE STANDARD OF CARE WAS BREACHED</u>

16. It is my professional opinion to a reasonable degree of medical certainty that Thomas Fasbender, D.O. and Brett T. Zimmerman, D.O., breached the applicable standard of care in the following manners:

a. Failing to monitor the maternal patient and the baby for signs of distress,

b. Failing to identify labor dystocia,

c. Failing to recognize the presence of tachysystole and late decelerations,

d. Failing to identify risk factors for traumatic birth,

e. Failing to discontinue oxytocin when indicated,

f. Failing to counsel the patient about the risk of birth injury, including shoulder dystocia, and failing to offer cesarean section when risk factors for traumatic birth became known;

g. Failing to timely and appropriately offer and perform cesarean section to prevent birth injury, and

h. Any other act or omission determined during discovery.

17. It is further my opinion that Brett T. Zimmerman, D.O., additionally breached the standard of care in the following manners:

a. Failing to recognize shoulder dystocia, and upon recognizing shoulder dystocia, timely and clearly instruct Ms. Foster not to push and appropriately direct and reinforce that instruction throughout the shoulder dystocia maneuvers,

b. Applying and/or allowing excessive traction during delivery,

c. Applying and/or allowing excessive lateral traction upon the fetal head,

d. Applying and/or allowing fundal pressure,

e. Failing to perform appropriate maneuvers in proper order for the appropriate amount of time to relieve shoulder dystocia, and

f. Any other act or omission determined during discovery.

18. Spectrum Health breached the applicable standard of practice or care when it negligently failed to do the following:

a. Select, screen, train, and employ only qualified personnel,

b. Provide MB proper medical care,

c. Employ or contract with physicians, residents, and nursing staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar locality,

d. Adequately supervise, direct, monitor and control these healthcare providers,

e. Truthfully and accurately document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, history and physical, discharge summary, shoulder dystocia documentation, operative reports, admission history and physical examination and plan of care,

f. Retain a full and complete legible copy of the medical record, and maintain and provide proper and adequate documentation including but not limited to progress notes, history and physical examination, discharge summary, operative reports, shoulder dystocia documentation, plan of

care regarding notification of physicians, nurses and staff for assessment and treatment, audit trails, audit logs, and revisions histories,

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

i. Interpretation of fetal heart monitor tracings,

ii. Informed consent to the patient regarding the risks and potential complications of Pitocin induction/augmentation of labor,

iii. Informed consent to the patient regarding the risks and potential complications related to shoulder dystocia,

iv. Management of Pitocin induction/augmentation of labor,

v. Maintenance/preservation of a patient's medical chart,

vi. Obstetrician staffing on L&D floor,

vii. Shoulder dystocia documentation,

viii. Shoulder dystocia management, and

h. Any other act or omission determined during discovery.

19. Holland Hospital breached the applicable standard of practice or care when it negligently failed to do the following:

a. Select, screen, train, and employ only qualified personnel,

b. Provide MB proper medical care,

c. Employ or contract with physicians, residents, and nursing staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar locality,

d. Adequately supervise, direct, monitor and control these healthcare providers,

e. Truthfully and accurately document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, history and physical examination, discharge summary, shoulder dystocia documentation, operative reports, admission and physical and plan of care,

f. Retain a full and complete legible copy of the medical record, and maintain and provide proper and adequate documentation including but not limited to progress notes, history and physical examination, discharge summary,

operative reports, shoulder dystocia documentation, admission and physical, plan of care regarding notification of physicians, nurses and staff for assessment and treatment, audit trails, audit logs, and revisions histories,

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

  i. Interpretation of fetal heart monitor tracings,

  ii. Informed consent to the patient regarding the risks and potential complications of Pitocin induction/augmentation of labor,

  iii. Informed consent to the patient regarding the risks and potential complications related to shoulder dystocia,

  iv. Management of Pitocin induction/augmentation of labor,

  v. Maintenance/preservation of a patient's medical chart,

  vi. Obstetrician staffing on L&D floor,

  vii. Shoulder dystocia documentation,

  viii. Shoulder dystocia management, and

h. Any other act or omission determined during discovery.

## III. <u>THE ACTIONS THAT SHOULD HAVE BEEN TAKEN OR OMITTED BY THE HEALTHCARE PROFESSIONALS AND FACILITIES IN ORDER TO HAVE COMPLIED WITH THE APPLICABLE STANDARD OF CARE OR PRACTICE</u>

20. To comply with the applicable standard of care, Dr. Fasbender and Dr. Zimmerman should have timely and appropriately done the following:

a. Monitor the maternal patient and the baby for signs of distress,

b. Identify labor dystocia,

c. Recognize the presence of tachysystole and late decelerations,

d. Identify risk factors for traumatic birth,

e. Discontinue oxytocin,

f. Counsel the patient about the risk of birth injury, including shoulder dystocia, and offer the patient the option of cesarean section when risk factors for traumatic birth became known,

g. Timely and appropriately offer and perform cesarean section to prevent birth injury,

h. Recognize shoulder dystocia, and upon recognizing shoulder dystocia, timely and clearly instruct Ms. Foster not to push and appropriately direct and reinforce that instruction throughout the shoulder dystocia maneuvers,

i. Refrain from applying or allowing excessive traction to be applied during delivery,

j. Refrain from applying or allowing excessive lateral traction upon the fetal head,

k. Refrain from applying or allowing fundal pressure to be applied,

l. Perform appropriate maneuvers in proper order for the appropriate amount of time to relieve shoulder dystocia,

m. Perform any additional actions that become known throughout discovery, and

n. Omit from doing any improper actions that become known throughout discovery.

21. In order to achieve compliance with the standard of care, Spectrum Health should have timely and appropriately done the following:

a. Select, screen, train, and employ only qualified personnel,

b. Provide MB proper medical care,

c. Employ or contract with physicians, residents, and nursing staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar locality,

d. Adequately supervise, direct, monitor and control these healthcare providers,

e. Truthfully and accurately document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, history and physical, discharge summary, shoulder dystocia documentation, operative reports, history and physical examination and plan of care,

f. Retain a full and complete legible copy of the medical record, and maintain and provide proper and adequate documentation including but not limited to progress notes, history and physical, discharge summary, operative reports, shoulder dystocia documentation, history and physical examination, plan of care regarding notification of physicians,

nurses and staff for assessment and treatment, audit trails, audit logs, and revisions histories,

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

i. Interpretation of fetal heart monitor tracings,

ii. Informed consent to the patient regarding the risks and potential complications of Pitocin induction/augmentation of labor,

iii. Informed consent to the patient regarding the risks and potential complications related to shoulder dystocia,

iv. Management of Pitocin induction/augmentation of labor,

v. Maintenance/preservation of a patient's medical chart,

vi. Obstetrician staffing on L&D floor,

vii. Shoulder dystocia documentation,

viii. Shoulder dystocia management, and

h. Perform any additional actions that become known throughout discovery, and

i. Omit from doing any improper actions that become known throughout discovery.

22. In order to achieve compliance with the standard of care, Holland Hospital should have timely and appropriately done the following:

a. Select, screen, train, and employ only qualified personnel,

b. Provide MB proper medical care,

c. Employ or contract with physicians, residents, and nursing staff who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar locality,

d. Adequately supervise, direct, monitor and control these healthcare providers,

e. Truthfully and accurately document the patient's medical record, including but not limited to progress notes, labor and delivery flow record, labor and delivery summary, history and physical, discharge summary, shoulder dystocia documentation, operative reports, history and physical examination and plan of care,

f. Retain a full and complete legible copy of the medical record, and maintain and provide proper and adequate documentation including but not limited to progress notes, history and physical, discharge summary, operative reports, shoulder dystocia documentation, history and physical examination, plan of care regarding notification of physicians, nurses and staff for assessment and treatment, audit trails, audit logs, and revisions histories,

g. Enact and enforce policies and procedures intended to maximize patient safety including but not limited to:

i. Interpretation of fetal heart monitor tracings,

ii. Informed consent to the patient regarding the risks and potential complications of Pitocin induction/augmentation of labor,

iii. Informed consent to the patient regarding the risks and potential complications related to shoulder dystocia,

iv. Management of Pitocin induction/augmentation of labor,

v. Maintenance/preservation of a patient's medical chart,

vi. Obstetrician staffing on L&D floor,

vii. Shoulder dystocia documentation,

viii. Shoulder dystocia management,

h. Perform any additional actions that become known throughout discovery, and

i. Omit from doing any improper actions that become known throughout discovery.

## IV. <u>PROXIMATE CAUSE AND INJURY</u>

23. As a direct and proximate result of the foregoing breaches by Thomas Fasbender, D.O. and Brett T. Zimmerman, D.O., MB was exposed to prolonged labor and traumatic vaginal delivery, including severe shoulder dystocia. Had cesarean section been timely performed, she would not have experienced shoulder dystocia and suffered the injuries that resulted. Had shoulder dystocia been properly managed by Dr. Zimmerman and dystocia protocol been followed, the injuries would not have occurred.

24. Dr. Fasbender's failures to recognize and respond appropriately to arrest or protraction of labor, tachysystole, and adverse fetal heart-rate changes allowed a prolonged and traumatic vaginal delivery attempt to continue when cesarean delivery should have been offered and performed. Timely cesarean

delivery would have avoided the subsequent vaginal shoulder dystocia and the forces that caused MB's brachial plexus injuries.

25. When Dr. Zimmerman assumed care, the labor history, duration of complete dilation and pushing, fetal station and progress, oxytocin exposure, and fetal-heart-rate findings required him to recognize that vaginal delivery presented an unreasonable risk of traumatic delivery and to proceed timely to cesarean section. His failure to do so permitted the vaginal delivery to continue and resulted in the subsequent shoulder dystocia and the forces that caused MB's injuries.

26. Regarding shoulder dystocia management, the record documents delivery of the fetal head at approximately 22:48, recognition of shoulder dystocia, performance of McRoberts positioning and suprapubic pressure, followed by episiotomy, posterior-arm removal and Reverse Woods corkscrew, and delivery of the body at approximately 22:49. The external TOCO does not display a discernible contraction during that recorded head-to-body interval.

27. If Ms. Foster was instructed not to push and complied, and no effective uterine contraction occurred during the head-to-body interval, improper or excessive clinician-applied traction or manipulation caused or contributed to the stretching, rupture, and avulsion injuries to MB's left brachial plexus.

28. Alternatively, if Ms. Foster continued pushing after shoulder dystocia was recognized because Dr. Zimmerman failed to provide, direct, and reinforce a timely and effective instruction to stop pushing—or if continued pushing was permitted or encouraged by the delivery team without correction by Dr. Zimmerman—the resulting maternal expulsive force continued while the fetal shoulder remained impacted and the delivery maneuvers were performed, thereby causing or contributing to the brachial-plexus injuries.

29. Spectrum Health's failure to adopt, implement, and enforce appropriate obstetrical policies and training concerning recognition of labor arrest, response to tachysystole and adverse fetal-heart-rate changes, timely escalation to cesarean delivery, and management of shoulder dystocia resulted in its agents' failure to perform a timely cesarean delivery and/or their improper management of the shoulder dystocia. Those failures exposed MB to the impaction and forces that caused her brachial-plexus injuries.

30. Holland Hospital's failure to adopt, implement, and enforce appropriate obstetrical policies and training concerning recognition of labor arrest, response to tachysystole and adverse fetal-heart-rate changes, timely escalation to cesarean delivery, and management of shoulder dystocia resulted in its agents' failure to perform a timely cesarean delivery and/or their improper management of the shoulder dystocia. Those failures exposed MB to the impaction and forces that caused her brachial-plexus injuries.

31. The injuries proximately caused by the aforementioned breaches resulted in injury and damages that include, but are not limited to: Severe left brachial palsy dysfunction, monoparesis, spinal root avulsion or rupture, the presence of cerebrospinal fluid in the area of C5-C6 and C6-T1, tendon injury, nerve injury, chronic atrophy of her left rotator cuff, deltoid, and biceps muscles, ongoing neurological problems, pain, weakness, the need for multiple surgeries, the need for future surgeries, permanent disability, and loss of earning capacity.

32. I swear or affirm that the foregoing statements are true and accurate, to the best of my knowledge and belief.

33. My opinions are preliminary because I have not reviewed any deposition testimony and may not have reviewed complete medical records.

34. I therefore reserve my right to amend or supplement my opinions after reviewing additional materials that may become available.

Fred Duboe , M.D..

FRED J. DUBOE, M.D.,

State of Texas County of Hidalgo

Signed and sworn (or affirmed) to before me on 09/25/2026 (Date) by Fred Duboe , MD (Name of Person Making Statement).

Jose Ricardo Gamboa

Signature of Notary Public

Notary Public, State of Texas

Title or Rank

My Commission Expires: 09/17/2028

(Seal)

NOTARY PUBLIC STATE OF TEXAS
Jose Ricardo Gamboa
ID NUMBER
132681524
COMMISSION EXPIRES
September 17, 2028

Electronically signed and notarized online using the Proof platform.